Good morning, everyone. The cases will be called in the order listed on the docket. For counsel, please be reminded that the time shown on the clock is your total time remaining. The first two cases, Singh v. Blanche and Saxon v. Bisignano, have been submitted on the briefs. The first case on calendar for argument is Google v. Point Financial. Counsel for appellant, please approach and proceed. May it please the court, I'd like to reserve two minutes for rebuttal. I begin today where the UCC itself begins, with its stated fundamental purpose to promote clarity and certainty in secure transactions. That certainty is precisely what is at stake today. The bedrock principle of Article 9 is to be the foundation of commercial lending in America. Funders rely on it, and it's promised that if you file your UCC-1 financing statement, you perfect your security interest, you have a superior right in the collateral against those who do not. The whole point of Article 9. Well, can we back up? I mean, I agree with you. You've perfected your security interest. But when you say against those who do not, you mean those who have security interests and do not perfect them, correct? Or those who have contractual rights that do not survive the foreclosure of a security interest. So either way, whether it's a security interest. What are you relying on? Do you believe that Google has a security interest, or do you believe that they have a contractual license? We believe that they have an unperfected security interest. But if the court disagrees and finds that it's only a contractual license, that contract is not, point financial, is not bound by that contract. We are not in privity with Google. We owe no contractual rights to Google. Google doesn't get to continue to use our intellectual property and our photo mask sets. That was a deal that they had with Cenex, not with point financial. So whether it's an unperfected security interest or a contract, right. Well, could you walk me through why it's a security interest first? Because I didn't. I mean, the contract says it's a license. Why isn't that the beginning and the end of that particular argument? Well, this court has determined that no magic words are required and the form doesn't matter. A security interest is is defined as an interest in personal property, which secures payments or performance of an obligation. Google has repeatedly argued that the purpose of Section 10.4 of the MPA was to secure Cenex's performance of its obligation. That's a security interest. Do we look at the intent of the parties at all as expressed in the contractual terms? Yes, we look both objective and subjective. And objectively, it is it satisfies the definition of a security interest. But in the contractual terms specifically expresses the intent of the parties that this is a security interest. Well, the parties don't have to intend that it be called a security interest. They have to intend that it ensure or secure the performance of an obligation. And that is the very language of Section 10.4. So you're relying on the language that says is to ensure the performance. It is. It is both the language in the contract and the post contract language of Google in arguing before the district court, which is that it was to secure Cenex's performance. Other than that, is there any other language in the contract that, in your view, expresses an intent that this be a security interest? No, they don't call it a security interest. It is not in the form of a security interest. But I just want to be clear as to what in the contract you are relying upon to say that this is a security interest. Simply the insurance of Cenex's performance. But does the contract say that to ensure Cenex's performance, it seemed that the provision was a form of cover. So Cenex would be out of business or unable to deliver the product. So they're not ensuring that Cenex will deliver or perform. They're ensuring that they have some means to obtain the chips that they need. And so it seems to me that that is not ensuring Cenex's performance. And that by its very terms, it could not be that since it assumes Cenex is insolvent. One way that 10.4 is triggered was that Cenex ceases business altogether. Another way would be if Cenex becomes insolvent by definition or fails to deliver chips in a timely fashion. So there were several different triggers under 10.4 and many of them did not require Cenex to go out of business. But it's still a situation in which Cenex is not performing. Somebody else is going to Google is going to take the intellectual property and the equipment and have presumably one of the vendors that was already doing the actual fabricating to have them do the work and provide the chips. Yes, that's what would kick in if 10.4 was triggered. That is correct, Your Honor. I agree with that. So it's not it's it's not ensuring performance in the like a collateral, like a traditional sense that you would think of as OK, now it's a security interest. It seems to be something different. Any time you have a security interest, the way that you ensure performance is through somebody other than the defaulting debtor doing something. Right. So if it would if it were taking property, a typical security interest would be you have a security interest in my car. I don't pay. You ensure performance. I'm still not going to pay. So you take my car. So this is Cenex didn't perform. So to ensure performance, they take the intellectual property and they take the physical manufacturing equipments. And that in that way, it ensures their performance. You're saying what this agreement did was essentially the intellectual property and the equipment was the collateral for what Google was paying under the contract. Yes. I don't know that we need to define anything as the collateral. But if you were going to define collateral, it would be both the intellectual property and the the photo mask sets, the physical equipment. Why don't you have to define what the collateral is to perfect security interest? You definitely have to determine what the what's being secured, correct? Yes. You you do have to have personal property under the definition of a security interest. I agree with that. It has to be an interest in personal property, both intellectual property and the mask sets or personal property under the statute. And then again, you have to have a securing of a performance or an obligation. So you are saying that those were the secure those were the that was the property that was subject to the security interest? Yes. I am. Yes. Does it matter that it was that the license that Google obtained was non-exclusive? So they could use it, but they didn't own it. So that is true. And intellectual property is uniquely the type of property where two people can use it at once. The photo mask sets, on the other hand, the actual physical equipment cannot be used by two people at the same time. So what the district court did was they put Point Financial, now the owner of the equipment in a situation where Google has prior rights or or priority rights to use the very equipment that Point Financial now owns. And Google gets to use it rather than Point Financial. And only one person. I don't know that that's necessarily true. I mean, has Point Financial said, hey, we need to use this. I mean, part of the problem is no one else can use this other than Google. I mean, this has no value for anyone else, does it? No, that is not correct, Your Honor. The photo mask sets are to make chips. Now, the chips at issue are custom to Google. That is true. But with some minor modifications to the intellectual property that they can they can be custom to any customer. Has PFI said, hey, we need access to these mask sets because it seems like you would have that right. We did. And the district court said it was interference with contract when we did. So that's exactly what we did. We said we are the secured creditor. We have rights to these mask sets. And Google sued us and said we interfered with their contract. And the district court agreed. So PFI has been Point Financial has been in the situation now since this injunction was entered of any time it tries to use its own physical property. It would be in violation of an injunction. And that is an absurd result. They are the owner of this equipment and they are not allowed to use it. And the attempt to use it was considered to be an interference with contract. So can Point Financial be in a position that is better than Cenex? In other words, Cenex was subject to these contractual obligations and agreements that had entered with Google. Point Financial knew about this. You did. They did due diligence. They saw the contracts. They made the loan. And now they're saying, but we're not bound by any of these contractual obligations. May I clarify one thing, Your Honor? The record shows that the contracts were provided to Point Financial. There is no evidence that Point Financial was actually aware of the contracts. But let me answer your question. So if they weren't, that seems to be a problem for Point Financial if they did not do due diligence when they made the loan. Well, they did do due diligence. What the testimony was, was that they were provided with an enormous amount of information that Google wasn't even the biggest customer Dell was at the time. And so they were not focused on this particular provision. But please let me answer your question. Yes, Point Financial can be in a better position than Cenex was because under the UCC, all contractual rights are extinguished. The debtor's obligations do not become the secured creditor's obligations. Those rights are extinguished once there's a foreclosure or a, you know, of default on the security interest. And is that the case even, I'm sorry, is that the, I understand your point if what Google had was a security interest. But if it's something else, if it's a license, for example, a license in the ordinary course of business, is that extinguished? Are you saying all licenses and other contractual obligations are extinguished even if they are not a security interest? I am, Your Honor. The official comment of UCC 9-321 comment 2 states, a licensee under a non-exclusive license takes subject to a perfected security interest. And all contract rights are extinguished unless it's a license in the ordinary course of business, if I may turn to that. This was not a license in the ordinary course of business for three reasons. And, Your Honor, did you have a question before I go into that? Well, what I'd like to hear now, the ordinary course of business is a factual finding, right? It is a factual finding. And the district court found that it was in the ordinary course of business. And the district court clearly erred. So what I'm going to be listening to, I understand your arguments. What I'm going to be listening for is why it was clear error on behalf of the district court. Thank you, Your Honor. I appreciate that guidance for three reasons. First, Cenex was not in the business of licensing its intellectual property and the very tools of manufacturing that it needed to provide chips. Cenex was in the business. Its ordinary course of business was selling chips, supplying chips. And that's what the contract says and that's what the record shows. So this was not its ordinary course of business. This was extraordinary. Second, it only was triggered. But I thought there was evidence that there were other contracts very similar to this. There was an off-the-cuff statement by a former CEO that there were other contracts like this. But what he was referring to was the master purchase agreement in general. And even if Cenex had made agreements with other companies that say if we go out of business, you can have our tools and our intellectual property, even if that were the case, it would only be triggered by Cenex going out of business. How can going out of business be the ordinary course of business? It just makes no sense. And third, there was no new value provided. Let me back up because it seems like it does make sense because Google's position was, look, you're a high-risk vendor to work with. The only way we're going to work with you is if we can have assurances that, you know, that if you go out of business, we're going to be protected. That doesn't seem like an unreasonable. I mean, to be one thing, I think your argument for out of the normal course is, hey, by the way, we're going out of business. Do you want a sweetheart deal? That doesn't seem like this is what this was four years before. You don't disagree with that, right? This was an agreement entered into 2016. It was there was collateral that was paid for this. So I think that's where I'm looking for. Why is that outside of the normal course of business? Why is that unusual? Why is that a sweetheart deal? And I don't see that. I don't think it had to be a sweetheart deal. The ordinary course of business exception was designed to protect consumers who buy off-the-shelf products that have a license. If I buy my smart TV and the company goes out of business and the secured creditor takes over, I get to continue to use that license. That is what the ordinary course of business licensee exception is intended to cover. Not this situation where it only was triggered if they went out of business. And in the small amount of time I have, I'd like to very quickly point out that in addition to the other reasons, this is a voidable transaction under the California Uniform Voidable Transactions Act. This transfer was made by a debtor when the debtor was insolvent and there was no equivalent value given. And I want to specifically talk about those photo mask sets that I talked about earlier. There was a mask authorization agreement that was signed by Cenex in April of 2024 when Cenex was insolvent, when Cenex was out of business, and there was no value given for that mask authorization agreement. And yet Google got it. It is absolutely a voidable transaction under Civil Code 343905, and I'd like to reserve some time for rebuttal. All right, counsel. Thank you. May it please the court, Fred Rowley, Jr. for Google. The district court saw Point Financial's conduct for what it was, a shakedown effort to exploit Google's supply chain vulnerability by depriving Google of the clear contractual protections it bargained for years before Point Financial ever entered the picture. There was no abuse of discretion in granting the injunction. The facts, the law, and the equities all compelled that result. I'd like to get right to that. Can I ask one question, and not to interrupt your train of thought, but the mask sets. Yes. It does seem to be a problem. You only have a non-exclusive right to them, right? We have an access right. Okay. So if PFI is asking to use them and the district court is refusing to allow them, why is that not an overbroad exertion of the injunctive authority? There's a few responses to that, Judge Nelson. The first is Point Financial took its security interests subject to the contractual rights that were in existence long before it acquired this perfected security. And those contract rights, of course, included access rights that Google could use to try to step in for Cenex, as Judge Bade pointed out, and work with the manufacturers to continue to produce the chips if Cenex couldn't do it. Exclusive access rights? It's an access right, Judge Rollins. Exclusive access rights? No, it's just an access right. Right. And so by definition, it can't be exclusive. But there's another point I think that's worth making here, because my friend used a lot of language about ownership, that now Point Financial owns the equipment. I believe she said the contract rights, our contract rights, do not survive, and that now Point Financial owns the physical property. But I come back to the terms of the agreement in 10.4C and D, and if you look at those terms, it makes clear that Google just has an access right. But if you also look at other provisions in the Statement of Work, I would look at Provision 7.2 of the Statement of Work, you'll see that Point Financial doesn't own these things, right? Did Point Financial have an access right? Your Honor, the rights aren't assignable, so it actually doesn't have that right. Section 16.7 of the MPA says that the rights are not assignable. And so it doesn't have, we submit, it doesn't have that right. But it never, C-NEXT didn't even own the property. And I think this is the essential point, that Point Financial is actually asserting that it has broader rights than C-NEXT never had. These chips, the photo masks, and the tooling and hardware equipment, and also the information that was escrowed pursuant to the license, those things all reflect Google's IP as well as Point Financial's IP. And the license that Google granted C-NEXT was limited. If you look at Section 7.2 of the SOW, Google granted C-NEXT a licensing right to use its intellectual property to produce the chips or it could make the chips and sell the chips, not the IP and not the photo masks, but the chips to a third party. Who owned the photo masks then? Your Honor, the photo masks were in the custody of, I think if you look at the Section 10.4, they were in the custody of the manufacturers. They were used to produce the chips. Who owned them, though? Who owned them, though? I think if anybody owned them, it was probably both – well, Google had an access right, so it would be C-NEXT. But I would say that – Yes, so C-NEXT – I'm sorry. C-NEXT had custody of them. I wouldn't say that they owned them. They just had custody of them. Well, maybe they owned them subject to a license. I mean there's no question that Google has a license with the right to sub-license to use, but it was non-exclusive. And so if it's non-exclusive, that suggests that from 2016 to 2020, C-NEXT, they had to perform for the license for Google, but they could have been selling these to others. Were they, or was there just no market elsewhere? Your Honor, I think that the latter point you made is exactly right. These are bespoke chips that were made for Google's infrastructure. So even though C-NEXT, under the terms of the SOW, had the right to sell the chips to third parties, it never tried to do that. And certainly Point Financial can't do that because the rights aren't assignable. But I'd like to go back to a fundamental point. I'm not sure I'm with you on that, that they're not assignable. I don't know. You seem to take that as a given. It seems to me that if they step into C-NEXT's shoes, I don't understand why they wouldn't have that. But, Judge Nelson, even if that's true, they can't acquire greater rights than what C-NEXT had. If C-NEXT was the owner and they stepped into C-NEXT's shoes, wouldn't they be the subsequent owner? But, Your Honor, whatever that owner – just assume for a second that they owned those. They didn't own the IP. Those things reflected Google's IP as well, and Google's IP was subject to limited licensing terms. And so C-NEXT couldn't have just taken the photo masks and sold them on the open market. That's not the question I'm asking. I totally agree with you because that would be a breach of contract because you have an irrevocable, non-exclusive, worldwide, fully paid-up, royalty-free license. That's a lot of words there, but it describes what you have. You still – in my view, you still have that. I know there are some debates on the other side about why that expired. But let's assume that that same thing flows through. You still only have a non-exclusive right. So they have a right to do something. Now, I guess the question is are they just manipulating it to say we want these so you can't produce them so that you have to come and ask us – but how do we distinguish that? They have some right. I don't know if it exists to use this. Judge Nelson, this was not developed in the district court because this focus on the tooling and hardware that is the subject of Section 10.4D is new on appeal. They made passing arguments, glancing arguments about 10.4D in the district court. But they didn't focus on that, and there's a good reason for that. If you read Section 10.4C and 10.4D together, they're meant to go hand in hand. All these things are intended to do, as Judge Bade noted, is to allow Google – Judge Badey. Badey – is to go in and carry out CNEX's coordination role and work with the manufacturers to produce these chips. That's the only purpose of the license. And so I go back to whether this is a security interest, and we know what a security interest looks like. There is one in the record. There is Point Financial's security agreement with CNEX. That can be found at Excerpts of Record 495, and it uses words like priority. It uses words like lean and collateral. And Section 10.4 uses none of that language because the licensing agreement doesn't function as collateral. Well, yeah, and I mean you've got a bigger – if this were a security, you'd have a bigger problem on your hands. That's right, Jerome. And so I don't think we'd even be talking about this because if this actually were a security, it would be non-secured and they would have priority. That's right. So I think we're only asking these questions because we're assuming that it's not a security. But at least I am still stuck with, yeah, but don't they have a right to use it? I mean you don't get to just say, no, you can't ever use these. Well, so look, the first point I think is that the rights – our position is that they are assignable. But Point Financial has never explained what it could do with either the information that is escrowed or the photo mask that would be consistent with the contract terms. It's just – what they've said instead is these very broad statements. In the reply brief, I would note that they say that Google is confiscating these rights. And now we hear that they own the equipment and that our contract rights don't survive. So they haven't articulated a theory of what they would do with these things that's consistent with the limited nature of Google's license and with the contract terms. I'm sorry. Yes, Judge Beatty. I understood your – the reason that Google sought the injunction was that Point Financial was contacting vendors and saying we own this equipment and you're in violation of our rights and that Google then in one instance at least had to indemnify a vendor to say no. That's right. Okay. So this was the issue. It wasn't that Point Financial was saying we want access to this equipment because we are going to manufacture chips or we're going to have somebody manufacture chips. So the way this was all teed up was in a slightly different context than what Judge Nelson is describing. That's right. So assuming this was not a security interest, then we turn – to me, we need to turn to the second issue, which is Point Financial's claim that Google's contract rights were extinguished, that it's just too bad. You were in a contract with a company that's now insolvent, and so you don't have these contract rights anymore. Can you address why that – why your position is that is not correct? Yes, Your Honor. I think it's just black-letter law. As the district court noted, and I think the court was right on this score, the court said PFI's rights to foreclose on Cenex's assets does not entitle PFI to greater property rights than Cenex held with regard to the customized software and tooling. And I think you need look no further than the requirements of the UCC to see that's right. Bedrock principles, as my friend said. And one of the requirements for a perfected security interest is in 9203b2, which says the debtor has rights in the collateral or the power to transfer rights in the collateral to a third party. And so Cenex never had any right to transfer to Point Financial rights that were apart from this conditional license that's in 10.4c. That is to say Point Financial took its security interest always subject to the contract rights that are set forth in 10.4c and 10.4d, and that's just right in the UCC. So it seemed that the district court was saying, well, this is not a security interest, but even if it were, this was a license in the ordinary course of business.  It sounds to me, unless I'm just misunderstanding your argument, that you're saying we don't even need to reach that, that this license agreement survived because Point Financial couldn't take a position that was superior to Cenex's. We're saying both, Your Honor, so sort of either way. We think that the more fundamental point is that the security interest is taken subject to these contract rights, and it's simply not the case that, as I think my friend argued, that the contract rights do not survive because there's a perfected security interest. We think that's wrong. But in any event, even if that were a plausible statement of law, which we think it is not, Google is still a licensee in the ordinary course, as the district court found, and I do think that is a factual finding subject to clear error review. And the record is, and I'll quote. So before we leave that, is there any case where there has been a determination that a non-consumer contract constitutes business in the ordinary course? It appears that most of those cases involve consumer contract for fungible goods where there's mass buying of those particular items. What case comes closest to saying that a license falls within that general rubric? Well, so, Judge Rawlinson, I'd actually point, again, back to the UCC, just the text. I'm asking you a different question. I'm asking you if there is a case that has interpreted ordinary course of business beyond the consumer arena. Your Honor, there's not a lot of case law in this area. Is there any case that has extended the concept of ordinary course of business beyond the consumer arena? Well, we would point to the California Court of Appeal decision in Regency Outdoor Advertising. But, again, I hasten to go back to the text of the UCC, which provides in Section 9317 that a licensee, quote, takes free of a security interest if the licensee or buyer gives value without knowledge of the security interest and before it is perfected. That's exactly what happened here. Before it was perfected, Google acquired this conditional license, and so Point Financial necessarily took its security interest subject to the license. But even if the court does not want to decide the case that way, it can still find and should affirm, because it's not clearly erroneous, the finding that Google is a licensee in the ordinary course. If there are no further questions. Well, can I – I do have one more question for you. So Google is a licensee in the ordinary course because these contractual provisions were commonly used by Cenex. That seems to be one avenue, or because Cenex was in the business of developing software and intellectual property. Your friend on the other side has described their business as selling chips. So why do you get to your conclusion that they are a licensee in the ordinary course of business? Judge Beatty, a couple of reasons. First, Point Financial sometimes argues as though Cenex manufactured the chips, but we know they didn't. The record is very clear that what it does or what it did was design and work with enterprise partners to design these bespoke chips that would then be produced by third-party manufacturers. And that is exactly what the MPA here was intended to do, was intended to provide for the development and then the production of chips for Google. And Section 10.4 furthered that interest as well because it ensured that there would be a steady supply of those chips. So it's bound up with the purpose of the contract and really bound up with Cenex's business in general. Point Financial tries to draw this artificial distinction I think between licensing and Cenex's business. But you need look no further than 10.1 of the MPA in which Cenex grants Google a license of the chips. Licensing was part and parcel of Cenex's business or was part and parcel of Cenex's business. So we think the district court was absolutely correct in concluding that this conditional license was in the ordinary course. Counsel, before – you've exceeded your time, but I have one final question. I have the Regency outdoor advertising case up. I want you to point me to the precise language in there that supports the notion that a license – could you let me finish? Yes, Your Honor. That a license can be in the ordinary course of business. I'm looking for the precise language because I didn't see it. So, Your Honor, I don't think it involved a license. I think we cited that case just for this general principle. That's what I thought. All right. Thank you, Counsel. Yes, Judge Rollins. Thanks.  Thank you. Judge Rollins, the case that's most on point factually in our opinion is North Star v. ICON. It's actually a Southern District of New York case, and the facts are strikingly similar to this case, and it rules the way that we believe this court should rule. Judge Nelson, I want to address something that you asked about. If this is not a security interest – maybe it was Judge Beatty – if this is not a security interest, then what Google has is something less than a security interest. All they have is a contract. And it is indeed black-letter law that we are not in privity with Google and we owe Google no duty. I want to once again draw the court's attention to Comment 2 of the UCC, the official UCC, not the California version, although it may be in the California version too. But the comment at 9-321 says that a license is subject to a perfected security interest, the exact opposite of what my friend said. The license is subject to the perfected security interest, not the other way around, unless it's a license. Does the timing depend? It does not. The UCC is very clear that unless you have two perfected security interests, timing does not matter. Otherwise, sophisticated customers like Google could simply bury springing licenses in every contract and circumvent every security interest. So that is not what the UCC says. Timing does not matter at all. But, Counsel, so you're saying that when the lender is aware of that contract, they're not bound by their knowledge of what the content of the contract is? Yes, that is exactly right. Is that your argument, that they are not bound? Even though they have knowledge of the contract terms, they are not charged with knowledge of those? Well, they may be charged with knowledge, but what their knowledge is, is that if they have a perfected security interest, it will extinguish that contract. But it comes after the contract. Yes. So you have knowledge that there is something that exists that may impair your security interest. So that's a difficult argument for me, to accept that you had knowledge that these contract terms existed, yet you shouldn't be held to knowledge of those contract terms. That's a difficult argument for me. Your Honor's question assumes that a contract right is a property right that flows with property, that when property is transferred, the contract goes with it. If I ran a furniture shop and I told, I gave a contract to a customer that said, you can come in and build your own furniture and use my equipment forever, and it's a contract, and the bank forecloses on me when I don't pay my loan, the bank is not going to have to honor the contract with my customer forever because it's not a property right that flows with the equipment. It is simply a contractual right. It is extinguished. So knowledge doesn't matter because what they would have known is that they weren't bound by somebody else's contract. I think the court is assuming that it's a property right that runs with the property, and that's what the UCC says it is not. It is simply a contractual right unless it's a consumer ordinary course of business licensee. Is that consistent with your argument that the tooling and the mask and all this equipment is property? Yes. Absolutely consistent, Your Honor. It is our property at this point. And to answer the question that counsel had a hard time with, it absolutely was never Google's property. It was Cenex's property, and it is now PFI's property. And, yes, just because I own property doesn't mean that some other, that the debtor who I got the property from, well, let's put it this way. If I bought the property, I wouldn't have to honor the contracts of the prior owner. Sure you would. I mean, I don't even understand that argument. So I'll go. You would buy it subject to the contract terms. You can't buy more than Cenex had. Cenex, if it had ownership, it had ownership subject to a non-exclusive license by Google. So if I buy a car, I'm subject to the agreement that the previous owner had with someone else that they could drive it for free on Sundays? No, you don't buy property subject to contracts. There's no case law to support that. The only exception is a licensee in the ordinary course of business. Otherwise, you don't buy subject to contracts. So is your best case, the Southern District of New York case that you cited, is that what you rely on for this? It is the most on point factually to our case, and the Southern District ruled exactly the way I'm asking this court to rule. Do you agree that we are applying California law? Yes. No, I understand that we have, as my friend said, there is very little case law here. The UCC simply governs, and it's black letter law. And it seems like the bankruptcy attorneys know this stuff like it's just black letter law, but we struggle with it. I know I struggle with it. So you know that we hesitate to forge into unterritory – excuse me. We hesitate to create state law or to make decisions of state law that it's not really our place to do. Do you think this needs to be certified to the California Supreme Court? I don't think so, Your Honor, because I think the UCC is very clear. It's based upon the statutes. There's very little case law, but the statutes are very clear. And I'm honestly surprised that there's this much disagreement about what the statutes say. I think that what happens is there's this concept of, oh, there's something just not right about this because Google came first. You know, their contract came first. But the law is actually quite clear about this, and the UCC is very clear about it. And it is or is not. The UCC is clear when there are two security interests, which one takes priority. But this is a little different situation. So that's the conundrum that we have.  It is also clear that a contract is – that a license is subject to a perfected security interest unless it's a license in the ordinary course of business. I mean, but that's the heart of it. And the district court said that it was. The district court said that it was. And I would once again remind the court that in the event that the court determines this is not a security interest, an unperfected security interest, and it's not – and it is a license in the ordinary course of business, we still have avoidable transaction issues. I understand. So your argument with respect to whether this is a security interest is that it guaranteed performance. But it doesn't matter for your argument that it wasn't guaranteeing that seen excess performance. I understand your point, Your Honor. But it was ensuring CNEX's performance. It wasn't – the way that CNEX would perform would be by letting them use the equipment and the license. But this was the obligation that it was ensuring. So I think you're thinking of it as, which I can understand, that CNEX had to actually do something. But any time you have a security interest, the debtor doesn't do something when they default. The collateral is taken or the license is given automatically. So thank you, Your Honor. Thank you, counsel. Thank you to both counsel for your helpful arguments. The case just argued is submitted for decision by the court.
judges: RAWLINSON, NELSON, BADE